IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON

JOHN ALLEN BOSTIC,

      Plaintiff,

v.                            CASE NO. 2:09-cv-00623

MICHAEL J. ASTRUE,
Commissioner of Social Security,

      Defendant.

## M E M O R A N D U M   O P I N I O N

This is an action seeking review of the decision of the Commissioner of Social Security denying Plaintiff's application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. This case is presently pending before the court on cross-motions for judgment on the pleadings. Both parties have consented in writing to a decision by the United States Magistrate Judge.

Plaintiff, John Allen Bostic (hereinafter referred to as "Claimant"), filed an application for DIB on September 15, 2006, alleging disability as of January 3, 2003, due to right hip, left shoulder, low back, and neck pain, high blood pressure and cholesterol. (Tr. at 11, 97-101, 122-29, 152-58, 176-82.) The claim was denied initially and upon reconsideration. (Tr. at 11, 58-62, 65-67.) On September 12, 2007, Claimant requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. at 71-72.) The

hearing was held on May 15, 2008, before the Honorable Theodore Burock. (Tr. at 21-55, 78-83, 91.) By decision dated November 28, 2008, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 11-20.) The ALJ's decision became the final decision of the Commissioner on May 29, 2009, when the Appeals Council denied Claimant's request for review. (Tr. at 1-3.) On June 8, 2009, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g).

Under 42 U.S.C. § 423(d)(5), a claimant for disability has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. § 404.1520 (2002). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. § 404.1520(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. § 404.1520(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. § 404.1520(c). If a severe

2

impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4.    Id. § 404.1520(d).   If it does, the claimant is found disabled and awarded benefits.   Id.   If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work.   Id. §§ 404.1520(e).   By satisfying inquiry four, the claimant establishes a prima facie case of disability.   Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981).   The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. § 404.1520(f) (2002).   The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because he has not engaged in substantial gainful activity since the alleged onset date. (Tr. at 13.) Under the second inquiry, the ALJ found that Claimant suffers

from the severe impairments of lumbosacral disc disease, cervical disc disease, clavicle impairment and leg impairment.  (Tr. at 13-16.)   At the third inquiry, the ALJ concluded that Claimant's impairments do not meet or equal the level of severity of any listing in Appendix 1.  (Tr. at 16-17.)   The ALJ then found that Claimant has a residual functional capacity for light work, reduced by nonexertional limitations.   (Tr. at 17-19.)   As a result, Claimant can return to past relevant work.  (Tr. at 19-20.)   On this basis, benefits were denied.  (Tr. at 20.)

Scope of Review

The sole issue before this court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence.   In Blalock v. Richardson, substantial evidence was defined as

> "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'"

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the courts "must not abdicate their traditional functions; they cannot escape their duty

4

to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

Claimant's Background

Claimant was 59 years old at the time of the administrative hearing. (Tr. at 25.) He has a high school education. (Tr. at 26.) In the past, he worked as a craft maintenance supervisor and shift supervisor at a hydroelectric plant for thirty-five years. (Tr. at 31, 430.)

The Medical Record

The court has reviewed all evidence of record, including the medical evidence of record, and will summarize it below.

Physical Evidence

Chiropractic Evidence

Records indicate Claimant received five chiropractic treatments at Chipley Chiropractic on December 1, 2000, January 19, 2001, January 31, 2001, March 28, 2001, and June 15, 2001. (Tr. at 186-96.) Claimant had massage and chiropractic manipulative therapy for neck and shoulder pain. (Tr. at 191, 195.)

Records indicate Claimant had one hundred ninety chiropractic treatments/office visits at Fayette County Chiropractic from August 27, 2001 to May 14, 2008. (Tr. at 197-288, 331-418, 502-19.)

Claimant had massage and chiropractic manipulative treatments for neck, mid back, low back, shoulder pain and various conditions. (Id.)

On June 13, 2007, Bobby G. Green, D.C. wrote to "Whom It May Concern" at Disability Determination Section:

> I have been this patient's treating physician for various conditions since December 2000. This patient was originally treated in our office for occasional mild neck and low back discomfort and initially required only occasional palliative care approximately 2-3 times a year. The patient was involved in a severe motor vehicle accident in 2002. He suffered a pneumothorax, as well as a severe sprain/strain injury to both his cervical-thoracic and lumbar regions.
>
> The patient was treated for these injuries and recovered from them sufficiently so that he was released from care later that year. He subsequently suffered a motor vehicle accident the following year in 2003 in which he fractured his right clavicle, and needed surgery to repair this. He once again suffered repeated cervical and lumbar sprain/strain injuries. He was treated for these injuries as well and recovered, although he had some lasting significant pain in both his cervical-thoracic and lumbar regions.
>
> The patient began to suffer from acute onset of right-sided cervical pain in 2006 which radiated down the C6-C7 dermatome of the right arm into the hand, and after an MRI [Magnetic Resonance Imaging] was performed of the cervical region he was found to have an HNP [Herniated Nucleus Pulposus] of that region, producing impingement upon the C6-C7 nerve root, and he subsequently required surgical repair to that area. He has done well with it but continues to suffer residual pain and weakness whenever he uses this area very much.
>
> This patient's repeated trauma over the last few years to his body have caused a now permanent and chronic sprain/strain type injury in all regions, which coupled with the cervical HNP now cause the patient to have significant pain with any activity. He is unable to use a weed eater or perform any long-term activity at home without being

6

forced to stop rather quickly by the pain.   It is my
opinion that this condition is permanent and most likely
progressive and that this patient will be unable to
perform at any full-time gainful employment in the
future.

(Tr. at 331-32.)

On May 14, 2008, Dr. Green wrote to Claimant's representative:
"...it is my opinion that due to his condition he is not able to
stand or walk more than two hours in an eight-hour period." (Tr.
at 501.)

Medical Evidence

On February 4, 2002, Claimant presented to the Emergency
Department at Stonewall Jackson Memorial Hospital via Lewis County
Emergency Medical Services following a single vehicle motor vehicle
accident wherein Claimant was an unrestrained passenger. (Tr. at
485-90.) Claimant was admitted to the intensive care unit for 24-
hours of observation and diagnosed with "1. A large right sided
traumatic pneumothorax.   2. Multiple various contusions and
abrasions over most of his body that were various as well as
scattered. 3. Victim of a motor vehicle crash." (Tr. at 487-88.)

On March 24, 2002, Claimant had an MRI of the lumbar spine at
Plateau Medical Center.   (Tr. at 289.)   Mary McJunkin, M.D.,
radiologist, reported "Minimal degenerative changes.  No evidence
of disc herniation." (Id.)

On April 16, 2003, records from Thomas Memorial Hospital
indicate Claimant was admitted after stating he had a fractured

7

left clavicle due to a motorcycle accident which occurred on April 13, 2003. (Tr. at 493.)  Claimant was diagnosed with a comminuted left clavicular fracture and underwent an "[o]pen reduction, internal fixation left clavicle" operation.  (Tr. at 496.)

Claimant was treated twelve times at New River Health Association from July 13, 2005 to January 4, 2008 for hyperlipidemia, hypertension, erectile dysfunction, low testosterone level, dermatitis, and chronic neck, back and shoulder pain by Mary M. McKelvey, M.D.  (Tr. at 449-57, 482-84.)  The progress note dated August 28, 2007 states: "John is here with multiple problems.  He has been turned down for disability again... His triglyceride level is very high, and he is going to try fish oil... Smoker for 40 years... Multiple problems including: (1) Hyperlipidemia.  (2) Chronic pain syndrome with herniated cervical disc."  (Tr. at 449.)

On July 13, 2005, Claimant had a chest x-ray at New River Health Association.  Ronald Cordell, M.D. noted: "Clinical Indications: Smoker... The heart is normal.  Pulmonary vascularity is normal.  There is no acute pulmonary infiltrate.  There is no evidence of pneumothorax.  Costophrenic angles are clear bilaterally.  There are prominent interstitial markings throughout both lungs.  There is screw and plate stabilization of the left clavicle."  (Tr. at 475.)

On September 13, 2005, James P. Tierney, M.D. of Urologic

Surgical Associates of Charleston, evaluated Claimant for his

erectile dysfunction stating:

> He had last seen me so long ago that actually we could
> not find his old chart. He offers at age fifty-seven
> that his erectile dysfunction that persists in spite of
> Viagra and now the Viagra at 100 mg., does not offer any
> response. He has a low serum testosterone but appears to
> have an adequate libido. On examination he was found to
> have bilateral femoral artery bruits and is known per
> your history to have elevated triglycerides... With
> today's evaluation I offered him a trial of Cialis and or
> Levitra and also arranged for him to see a cardiologist
> for a stress test, with Dr. Stanton. If in fact the
> stress test is negative and the Cialis or Levitra do not
> offer any improvement of his erectile dysfunction, I will
> offer an Adrogen and testosterone supplement.

(Tr. at 290.)

On September 9, 2006, Claimant had a MRI cervical spine

without contrast at Charleston Area Medical Center ["CAMC"]. John

A. Willis, M.D. found:

> There is a disc protrusion centrally and in the right
> parasagittal region at C6-7 consistent with disc
> herniation. This is causing effacement of the right
> lateral recess and the thecal sac and may well be
> resulting in radicular symptoms on the right. There may
> well be a small extruded fragment. There is a milder
> disc protrusion at C5-6, which is more diffuse in nature
> and I am not convinced that this represents an additional
> disc herniation. There is mild spondylosis at multiple
> other levels, but no additional evidence of disc
> herniation. There is some mild spinal stenosis at C6-7
> related to the disc pathology and degenerative changes.
>
> IMPRESSION:
> 1. Disc herniation at C6-7 extending into the right
> lateral recess with probable small extruded fragment at
> this level.
> 2. Diffuse disc bulge C5-6.
> 3. Mild spinal stenosis C6-7.

(Tr. at 459-60.)

On September 13, 2006, Sabatino Bianco, M.D. evaluated Claimant upon referral by Bobby Green, D.C.  Dr. Bianco wrote:

> Approximately eight weeks ago the patient was playing golf with his grandson and later that evening he developed a right posterior shoulder pain that has progressed in severity since... He has not attempted physical therapy, however, he has been treated with chiropractic spinal manipulation since that time...Retired since December 31, 2003...
>
> IMPRESSION: This is a 58-year-old man with severe C7 radiculopathy as well as a large disc herniation.
>
> RECOMMENDATION: I discussed with Mr. Bostic that since he has failed conservative management for more than eight weeks and he has a severe grip deficit in the right hand along with radiculopathy symptoms, he is a candidate for a C6-C7 anterocervical diskectomy and fusion.  I discussed with the patient possible complications of this operation.

(Tr. at 311-13.)

On September 18, 2006, Dr. Bianco, performed a C6-C7 anterior cervical diskectomy and fusion on Claimant at Charleston Area Medical Center ["CAMC"].  (Tr. at 291-307.)

On October 12, 2006, Dr. Bianco examined Claimant as a follow-up to his cervical diskectomy and fusion surgery.  (Tr. at 308-16.) Dr. Bianco observed:

> The patient states that the pain in his shoulder and arm almost immediately resolved after surgery.  He has regained much of his strength in his right arm and his pain has virtually resolved.  He still reports some minimal aching in his shoulders bilaterally.  Overall, he is exceptionally pleased with the outcome of his surgery...
>
> RADIOGRAPHIC STUDIES: Cervical spine x-ray AP/lateral dated 10/12/2006 show good alignment with good hardware positioning.  No hardware malfunction...

10

I am pleased to see Mr. Bostic doing so well.  We have
encouraged him to continue with his rehabilitation and
continue with the strengthening in the right arm.

(Tr. at 308.)

On December 19, 2006, a State agency medical source completed
a Physical Residual Functional Capacity Assessment and opined that
Claimant could perform medium work with the exertional ability to
occasionally lift 50 pounds, frequently lift 25 pounds, stand
and/or walk and sit (with normal breaks) for a total of about 6
hours in an 8-hour workday, and to have unlimited push and/or pull
abilities, other than as shown for lift and/or carry.  (Tr. at
323.) Claimant was found to be able to frequently climb ramp/
stairs, kneel, and crouch, and to occasionally climb ladder/rope/
scaffolds, balance, stoop, and crawl.  (Tr. at 324.)  Claimant was
determined to have no manipulative, visual, or communicative
limitations.  (Tr. at 325-26.)  Claimant's only environmental
limitations were to avoid concentrated exposure to extreme cold,
vibration, and hazards.  (Tr. at 326.)  The evaluator, Caroline
Williams, M.D., concluded:

> Claimant's allegations are not totally credible in that
> the alleged symptoms and subsequent disability are
> disproportionate to the medical evidence found in the
> file...
>
> Most recent neurosurg[ical] eval[uation] 10/12/06 reports
> Claimant states "...pain in his shoulder and arm almost
> completely resolved after surg[ery]." and "...has
> regained much of his strength in his r[ight] arm..."
> Surg[ery] 09/06 without complication and normal
> recovery...

11

> Claimant's ADL [activities of daily living] do not appear
> to be as limited by physical impairments to the degree of
> which claimant alleges.  MER [medical evidence of record]
> does not support the presence of significant physical
> impairment limitations nor the degree of disability
> claimant alleges and therefore, RFC is reduced to medium
> exertional with postural and environmental limitations as
> noted...

(Tr. at 327.)

On March 7, 2007, Claimant had a lumbar spine x-ray at St.
Francis Hospital.  David Abramowitz, M.D., radiologist, found:

> No acute displaced fracture or dislocation.  There are
> Schmorl's type defects noted in the lower thoracic and
> upper lumbar spine.  There is mild hypertrophic spurring
> at multiple levels.  There is mild narrowing of the L5-S1
> disk space.  Note is made of extensive vascular
> calcifications.  The calcifications overlying the kidneys
> may be vascular in origin.  IMPRESSION: No acute bony
> pathology.  Mild degenerative arthritis as described
> above.

(Tr. at 458.)

On July 10, 2007, a State agency medical source completed a
Physical Residual Functional Capacity Assessment and opined that
Claimant could perform light work with the exertional ability to
occasionally lift 20 pounds, frequently lift 10 pounds, stand
and/or walk and sit (with normal breaks) for a total of about 6
hours in an 8-hour workday, and to have unlimited push and/or pull
abilities, other than as shown for lift and/or carry.  (Tr. at
420.) Claimant was found to be able to occasionally perform all
postural activities.  (Tr. at 421.)  Claimant was determined to
have no manipulative, visual, or communicative limitations.  (Tr.
at 422-23.)  Claimant's only environmental limitation was to avoid

vibration.   (Tr. at 423.)   The evaluator, Rogelio Lim, M.D.,

concluded:

> Allegations partially credible. Hx [history] of cervical
> diskectomy with fusion last 9-006 but no residual
> radiculopathy and neurologically intact.   Mild hpn
> [hypertension] but no end organ damages.   Normal ADL
> [activities of daily living].  Able to do yard work,
> weeding, hikes, play golf.  LS [lumbosacral] sprain and
> xray mild DJD [degenerative joint disease].

(Tr. at 424.)

On September 25, 2007, Dr. McKelvey of New River Health

Association completed a "Medical Assessment of Ability to Do

Work-related Activities (Physical)" form for Claimant's

representative.  (Tr. at 477-80, 484.)  Dr. McKelvey stated:

"He had a job that he really enjoyed and was very well paid.

He would not be applying for Social Security unless there was

no other alternative."   (Tr. at 480.)   She concluded: "My

impression is that he is totally disabled.  He is not able to

do any sort of physical labor.   He cannot sit still long

enough to do sedentary labor because of pain."  (Tr. at 484.)

Psychiatric Evidence

On July 27, 2007, Claimant underwent a consultative

psychological evaluation by Lester Sargent, M.A. for the West

Virginia Disability Determination Service.  (Tr. at 428-34.)  Mr.

Sargent stated that Claimant was laid off from his job at in 2003

whereupon "he retired and has not attempted to work since that time

due to chronic pain... No history of mental health treatment was

reported." (Tr. at 429.) He noted that Claimant's social functioning, persistence and pace were within normal limits and that his concentration was mildly deficient. (Tr. at 430-31.) He gave Claimant a "fair" prognosis and diagnosed "pain disorder associated with both psychological factors and a general medical condition." (Tr. at 431.) Claimant's daily activities were described as:

> The claimant arises around 6 a.m. He is able to perform all basic self-care duties without assistance. He helps with household chores to include cooking, laundry, dishes, and sweeping. He also occasionally performs yard work using a riding lawn mower. His daily routine begins with drinking a cup of coffee and smoking a cigarette. He reads the newspaper, watches television, and spends a good part of the day in his garage where he listens to the radio and tinkers with his motorcycle. He helps with household chores in the afternoon because his wife is currently unable to work because of a broken foot. He eats dinner at various times. At night, he takes a shower, watches television, and goes to bed around 12 a.m.

(Id.)

On August 1, 2007, a State agency medical source completed a Psychiatric Review Technique form. (Tr. at 435-48.) The evaluator, Tasneem Khan, Ed.S., Ed.D., found Claimant's impairment was not severe. (Tr. at 435.) He found Claimant had mild restrictions of activities of daily living, difficulties in maintaining social functioning, maintaining concentration, persistence, or pace and no episodes of decompensation. (Tr. at 445.) Dr. Khan noted that Claimant "alleges having depression and anxiety. He appears credible... He has no hx [history] of mental

14

tx [treatment]... There is no evidence of significant limits due to a mental disorder." (Tr. at 447.)

<u>Claimant's Challenges to the Commissioner's Decision</u>

Claimant asserts that the Commissioner's decision is not supported by substantial evidence because the ALJ failed to provide an explanation of why he relied on the <u>Dictionary of Occupational Titles</u> (DOT) as the definition of requirements for Claimant's past work, rather than rely on the vocational expert's ["VE"] testimony regarding the demands of Claimant's occupation. (Pl.'s Br. at 9-12.)  Specifically, Claimant asserts that

> Although Social Security Regulations allow the ALJ to rely on resources such as the DOT as presumptively applicable to the claimant's past work, the claimant's testimony may rebut the presumption that such a resource accurately states the demands of the claimant's occupation. Furthermore, the ALJ must give reasons for disbelieving the claimant's description of his job.
>
> In this case, both the VE witness and the plaintiff testified that the plaintiff's past relevant work exposed him to vibration due to the age of the equipment at the hydroelectric station where he worked.  This testimony was not controverted.
>
> The ALJ chose to rely on the DOT as the presumptive definition of requirements for the plaintiff's past work. The DOT states the plaintiff's past work is performed at the light exertional level and that it does not involve exposure to vibration.
>
> The plaintiff's and VE's testimony rebuts the presumption regarding the demands of the plaintiff's occupation regarding exposure to vibration.
>
> Pursuant to SSR 00-4p, when conflicts arise between occupational evidence provided by a VE and information supplied by the DOT, the adjudicator must resolve the conflict by determining a reasonable explanation for

relying on either the VE or the DOT.

In this case, the ALJ provided no explanation of his choice of the DOT. We are left to speculate as to his reasons and have no way to determine whether his choice was supported by substantial evidence.

(Pl.'s Br. at 10-11.)

The Commissioner argues that substantial evidence supports the ALJ's Decision that Claimant could perform a limited range of light work, including his past work as a Hydroelectric Plant Operator. (Def.'s Br. at 8-13.) Specifically, the Commissioner asserts that

Plaintiff contends he is unable to perform his past work because it involved exposure to vibration (Pl.'s Br. at 10.) He relies on his own testimony that his job involved exposure to vibration, and the VE's testimony that his past job as he performed it involved exposure to vibration. The ALJ, however, found that Plaintiff could perform his past job as it is generally performed in the national economy. In so finding, the ALJ relied on the VE's testimony that, according to the DOT, the job of hydroelectric station operator does not involve exposure to vibration (Tr. 49-51). In fact, the vocational expert explained that the DOT entry for hydroelectric station operator stated "not present" with respect to exposure to temperature extremes, moisture, humidity, and vibration (Tr. 51).

Plaintiff also contends that there is an unresolved conflict between the VE's testimony and the information contained in the DOT (Pl.'s Br. at 10.) Plaintiff is mistaken in this contention. The Agency has stated that where there is a conflict between the vocational evidence provided by the VE and that contained in the DOT, the ALJ must obtain a reasonable explanation for the conflict and explain how any conflict has been resolved. Social Security Ruling 00-4p: Use of Vocational Expert and Vocational Specialist Evidence, and Other Reliable Occupational Information in Disability Decision. Here, there is no conflict between the VE's testimony and the information contained in the DOT. That is, the VE testified, and the DOT provides, that the job of hydroelectric station operator is performed at the light

16

exertional level.  Rather, the difference at issue is
between Plaintiff's testimony that he performed his job
at the sedentary level and the DOT provision that the job
is performed at the light exertional level. The VE,
however, did not disagree.  That is, the VE testified
that although Plaintiff performed his job at the
sedentary level, the job as it is described in the DOT is
performed at the light exertional level.  The ALJ
acknowledged this difference but found, correctly, that
Plaintiff could perform his past work as it was generally
performed in the national economy at the light exertional
level, consistent with both the VE's testimony regarding
the job as it is generally performed, and the DOT.

(Def.'s Br. at 11-12.)

The court finds Claimant's argument related to the DOT
unconvincing. (Pl.'s Br. at 9-11.)  Substantial evidence supports
the ALJ's findings that Claimant can perform his past work as it
was generally performed in the national economy at the light
exertional level, consistent with both the VE's testimony regarding
the job as it is generally performed, and the DOT.  Contrary to
Claimant's assertion, there is no unresolved conflict between the
VE's testimony and the information contained in the DOT.  (Pl.'s
Br. at 10.)

While Claimant is correct in stating that where there is a
conflict between the vocational evidence provided by the VE and
that contained in the DOT, the ALJ must obtain a reasonable
explanation for the conflict and explain how any conflict has been
resolved per Social Security Ruling 00-4p, in this case, there is
no conflict between the VE's testimony and the information
contained in the DOT.  That is, the VE testified, and the DOT

provides, that the job of hydroelectric station operator is performed at the light exertional level. Rather, as pointed out by the Commission, the difference at issue is between Claimant's testimony that he performed his job at the sedentary level and the DOT provision that the job is performed at the light exertional level. The VE here did not disagree.  The VE testified that although Claimant performed his job at the sedentary level, the job as it is described in the DOT is performed at the light exertional level.  (Tr. at 46.)

The ALJ properly acknowledged this difference but found that Claimant could perform his past work as it was generally performed in the national economy at the light exertional level, consistent with both the VE's testimony regarding the job as it is generally performed, and the DOT:

> In comparing the claimant's residual functional capacity with the physical and mental demands of this work, the undersigned finds that the claimant is able to perform it as generally performed. The vocational expert testified that, based on her experience, the job of operator at the hydroelectric station where the claimant was employed involves exposure to vibration. However, the DOT states the job is performed at the light exertional level and that it does not involve exposure to vibration.  While the undersigned has considered all of the vocational expert's testimony, he will rely on the Dictionary of Occupational Titles' (DOT's) description of the job as it relates to how the job is generally performed in the national economy and not how the job may have been performed at the claimant's station.

(Tr. at 19-20.)

Claimant next argues that "[n]ewer hydroelectric equipment

would not cause as much vibration but would require new skills requiring further education and certifications.   Therefore, the plaintiff's skills would not transfer to a job in a new hydroelectric station contemplated by the DOT without vibration."
(Pl.'s Br. at 11.)

The Commission responds that the evidence does not show that Claimant's job as a hydroelectric station operator requires an SVP higher than seven:

> First, the VE also testified that, "no doubt over the years" there had been some upgrading of equipment at Plaintiff's former job (Tr. 46).   Second, the ALJ relied on the VE's testimony based on the information contained in the DOT, which provides that the job is performed with an SVP of seven.
>
> Moreover, the fact that Plaintiff performed his past work within fifteen years resolves any possible concerns about changes in skill level related to modernization of equipment... Here, Plaintiff performed his job as recently as 2003, when he stopped working.

(Def.'s Br. at 12-13.)

Regarding Claimant's argument that he is unable to perform his past relevant work because new equipment would require additional skills and his skills were not transferable, the undersigned finds this unconvincing in light of Claimant performing the hydroelectric station operator job as recently as 2003.   The regulations define past relevant work as "work that you have done within the past 15 years, that was substantial gainful activity, and that lasted long enough for you to learn to do it." 20 C.F.R. §404.1560(b)(1).   The regulations explain that the Social Security Administration usually

does not consider work that a claimant has done 15 years or more earlier because a gradual change occurs in most jobs, so that after fifteen years, it is no longer realistic to expect that skills and abilities acquired in a job done then continue to apply: "The 15-year guide is intended to insure that remote work experience is not currently applied... If you have acquired skills through your past work, we consider you to have these work skills unless you cannot use them in other skilled or semi-skilled work that you can now do." 20 C.F.R. §404.1565(a). Here, Claimant's performance of his past relevant work is well within the 15-year time frame.  The ALJ did not err in determining that Claimant retained skills and abilities to perform his past relevant work as it is generally performed in the national economy.

Finally, Claimant argues that both state agency medical experts imposed environmental limitations on Claimant's physical residual functional capacity which included avoiding concentrated exposure to vibration yet the ALJ "gave significant weight to the opinion of Doctor Lim (TR 19) but little weight was given to the opinion of Doctor Williams (TR 18) without explanation of this contradiction on this crucial issue." (Pl.'s Br. at 11.)

The undersigned finds that contrary to Claimant's assertion, the ALJ acknowledged both doctors' opinions that Claimant should avoid concentrated exposure to vibration and provided substantial explanations regarding the opinion evidence. (Tr. at 18-19.) It

is further noted Claimant's argument is puzzling in light of the fact that Dr. Williams found that Claimant could perform up to medium work, while Dr. Lim found Claimant was limited to light work. (Tr. at 322-29, 419-26.)

After a careful consideration of the evidence of record, the court finds that the Commissioner's decision is supported by substantial evidence. Accordingly, by Judgment Order entered this day, the final decision of the Commissioner is **AFFIRMED** and this matter is **DISMISSED** from the docket of this court.

The Clerk of this court is directed to transmit copies of this Order to all counsel of record.

ENTER: July 8, 2010

Mary E. Stanley
United States Magistrate Judge